IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| Bobby E. Shockley, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:19cv909 (RDA/TCB) |
| | ) | |
| Sgt. Foster, et al., | ) | |
|     Defendants. | ) | |

## MEMORANDUM

Bobby E. Shockley, ("Shockley or "Plaintiff"), a Virginia inmate proceeding pro se, filed a civil rights action pursuant to 42 U.S.C. § 1983 alleging that defendant Sgt. Shaun Foster violated his Fourteenth Amendment rights while Shockley was detained at the Rappahannock Regional Jail ("RRJ"). [Dkt. No. 1].[1] Following the filing of two amended complaints, the Court ordered that Shockley's third amended complaint be filed and served on defendant Foster.[2] [Dkt. Nos. 17, 18]. Defendant Foster moved for summary judgment, with a supporting brief and an affidavit. Plaintiff received the notice required by Local Rule 7(K) and Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975) [Dkt. No. 40], but he has not responded.[3] Thus, the motion is ripe for disposition. For the reasons that follow, defendant's motion must be granted.

The operative complaint concerns an incident that occurred on February 28, 2019 while Shockley was a pretrial detainee in the RRJ. Plaintiff asserts that he was "in crisis" on this date

---

[1] In the June 18, 2020 Order, the Court dismissed a First Amendment claim, but found that the third amendment complaint stated Fourteenth Amendment violations for use of excessive force and deliberate indifference to a serious medical need. [Dkt. No. 18 at 1].

[2] A second defendant, identified as "CNA Nurse Kobi," was dismissed on Shockley's motion on April 29, 2021. [Dkt. No. 35]. Also, in the second amended complaint Foster's last name was misspelled, "Froster." The docket will be amended to terminate "Froster" as an inadvertent duplicative.

[3] Plaintiff was released from custody on March 17, 2021. [Dkt. No. 34].

and was "experiencing hallucinations of faces coming out of the floor." [Dkt. No. 17 at 5]. Defendant Foster was one of the RRJ personnel that interacted with Shockley during this episode. Shockley alleges that he was compliant, laid down on the floor with his arms extended away from his body, and restraints were applied to his arms and legs. At that point, he alleges defendant Foster told Shockey he was going to tase him in the back, and then defendant Foster tased Shockley in the back. Shockley alleges he was then placed in the shower and after he got out of the shower he was placed in the restraint chair for two hours, during which time he requested and was denied medical assistance on five separate occasions. [Dkt. No. 17 at 5-6].

Defendant Foster's motion for summary judgment disputes Shockley's narrative of what transpired on the evening of February 28, 2019. Foster's motion states there were three interactions over several hours between Shockley and RRJ officers. Each of the three interactions were initiated after Shockey refused to obey orders. In each instance, because Shockley was on suicide watch, the officers had to apply restraints to remove Shockley from his cell. Shockley resisted the efforts of several correctional officers to place him in restraints, and defendant Foster used a taser on Shockley only after his efforts and the efforts of the other officers failed to get him in restraints during the second interaction on February 28, 2019. During the second interaction, Shockley complied after being tased, he was placed in restraints, seen by a nurse, and then placed in a restraint chair for slightly less than two-and-one-half hours. Defendant Foster denies Shockley's allegations that the use of the taser was excessive and that Shockley was denied medical care.

## I. Undisputed Facts

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). Defendants, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56, set forth a statement of material facts that defendants contend are undisputed. Plaintiff has not responded.[4] The undisputed facts in accordance with Local Civil Rule 56(B) are as follows:

1. Plaintiff was a pretrial detainee at RRJ on February 28, 2019 and was housed in the Crisis-2 medical unit ("Crisis-2") on suicide watch, which required that he be escorted by at least two officers in full restraints when outside of his cell. [Dkt. No. 39-1 at 10, 13].

2. On February 28, 2019, at approximately 1600, Officer Johnson heard a banging noise in Shockley's cell, which turned out to be Shockley hitting his head on the floor of the raised portion of his cell. [Id. at 6]. Shockley refused to respond to Officer Johnson's verbal inquiries into why he was hitting his head and Officer Johnson called Lt. Candler, who came to the Crisis-2 to speak with Shockley. [Id. at 6, 10].

3. At about 1610, Shockley informed Lt. Candler that he was upset because Mental Health would not speak to him and he was hearing voices. [Id.]. Lt. Candler asked Shockley if he was a threat to himself, to which he replied that "he was ok and did not need to be placed in the restraint chair." [Id.]. Lt. Candler then went to review the video footage taken prior to his conversation with Shockley and found that Shockley had hit his head on the floor four times. [Id.]. Lt. Candler then returned to Shockley with Nurse Adusei and ordered him to come to the

---

[4] The original complaint was not verified, and the three amended complaints are also not verified. The law is clear that a plaintiff cannot rely on an unverified complaint in opposing a motion for summary judgment. See Berry v. Atlantic Coast Line R.R. Co., 273 F.2d 572, 582 (4th Cir. 1960) ("The allegations of plaintiff's unverified complaint will not suffice."); Higgins v. Scherr, 837 F.2d 155, 156-57 (4th Cir. 1988) ("the opponent of a summary judgment motion has a burden of showing ... the existence of a genuine dispute of material effect and cannot simply rest upon his unverified complaint.") (citing Celotex Corp. v. Catrett, 477 U.S. 317 (1986))). When a party fails to specifically respond to the facts alleged in a motion for summary judgment, it "leave[s] uncontroverted those facts established by the motion." Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993); see Fed. R. Civ. P. 56(c) (1); E.D. Va. Local Civ. R. 56(B) ("In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statements of genuine issues filed in opposition to the motion.").

3

door so the Nurse could look at his head. [Id.]. Shockley refused to come to the door to allow Nurse Adusei to check his head. [Id. at 6, 10, 13].

4. Lt. Candler authorized Cpl. Coleman, Officer Brooks, and Officer Johnson to extract Shockley from his cell in order for Nurse Adusei to examine his head. [Id. at 6, 10, 13, 16]. After he was restrained with handcuffs and leg restraints, Nurse Adusei examined Shockley's head at 1617 and "cleared" him of any injuries. [Id. at 6, 10, 13, 16, 67]. Shockley told Nurse Adusei that he "was fine," had "no injury to his head," and his restraints were removed. [Id.].

5. Later that day, at about 1750, Officer Johnson observed Plaintiff via camera smearing what appeared to be feces on his cell window. [Id. at 22]. Officer Johnson asked Shockley why he was writing on his cell window with feces and ordered him to stop. Shockley ignored Johnson, and Johnson notified Lt. Candler. [Id.].

6. At about 1800, First Sgt. Franzen arrived in Crisis-2 and observed Shockley finger painting with feces on his cell wall. [Id. at 24]. Franzen asked Shockley about his behavior several times. Shockley ignored him and continued to write on his cell with his feces. [Id.]. Due to a shift change, RRJ personnel on shift did not have time to extract Shockley from his cell in order to clean Shockley and his cell, and informed the next shift of the issue. [Id.].

7. Cpl. Connolly began his shift and asked Shockley why he smeared fees on his walls, window, and cell camera. [Id. at 26]. Shockley stared at Cpl. Connolly, but did not respond or comply when asked to stop. [Id.].

8. First Sgt. Adcock was advised of the situation with Shockley and went to Crisis-2 at 1900. Adcock did not observe Shockley writing with his feces, but did note the words "devil" and "Kishana" (Shockley's wife) in Shockley's cell. Shockley was standing, naked, at the back of his cell and swinging his safety blanket in an aggressive manner. Shockley was yelling that

4

someone was coming out of the floor grate and was attempting to harm him, and that there was someone in his cell that he would harm them if they came any closer. Adcock directed Shockley to get dressed and come over to the door to talk with him. Shockley ignored Adcock, who then repeated his directions and Shockley responded that he could not comply because "he is coming to get me." [Id. at 28]. Adcock tried several more times, explaining that Shockley needed to be placed in the shower and his cell needed to be cleaned. Shockley replied that he could not because "someone was going to kill him." [Id. at 29].

9. Adcock requested Sgt. Hurd to come to Crisis-2 to see if Shockley would listen to him. At approximately 1924, Adcock and Hurd addressed Shockley and told him to place his hands through the tray slot and he refused their direct orders. Adcock told Shockley compliance was not optional, and he needed to be removed from the cell. Shockley stood at the back of his cell and stared at the wall. Adcock notified Lt. Reid of Shockley's noncompliance. [Id. at 29].

10. At 1929, Lt. Reid consulted with Lt. McRae, and they decided they would use the SRT (Special Response Team) to perform a non-compliant cell extraction. [Id. at 29, 32, 34-35].

11. Sgt. Foster and Sgt. Teye of the SRT team attempted to speak to Shockley to get him to comply with orders that would allow him to be removed from his cell without success and went to discuss the non-compliant cell extraction. [Id. at 39, 41].

12. At 2038, the SRT team entered the Crisis-2 unit and were briefed on how they would extract Shockley. [Id. at 35, 39, 41, 43, 44]. After several more attempts to reason with Shockley failed, at approximately 2042, Sgt. Foster, Sgt. Teye, Sgt. Shaw, Cpl. Spoone, and First Sgt. Adcock entered the cell and ordered Plaintiff to get on the ground. [Id. 35, 39-40, 41, 43, 44].

13. Sgt. Teye used a shield against Shockley to pin him in the corner of his cell and the other SRT members took Shockley to the floor as they tried to get control of his arms and legs.

5

All the while, Shockley refused repeated orders to place his hands behind his back, keeping one arm underneath of his person. Sgt. Teye was unsuccessful in using various techniques to get Shockley's arm from underneath him. Sgt. Shaw gained control of Shockley's right hand and Cpl. Spoone had control of his feet and was able to place him in leg restraints. Sgt. Foster had given Shockley multiple orders to place his hands behind his back, which Shockley ignored. Sgt. Foster then advised Shockley that if he did not place his hands behind his back that he would be tased. [Id. at 40, 41, 43, 44].

14. Sgt. Foster unholstered his taser, announced "taser taser taser" and deployed "a 5 second stun drive to [Shockley's] right shoulder," after which the SRT was able to restrain him. [Id. at 29, 40, 41, 42, 44].

15. Shockley was then removed from the cell, secured in a restraint chair at 2049, and Nurse Quaye "checked and cleared his restraints." [Id. at 35, 40, 42, 43, 44-45].

16. Sgt. Foster also requested that Medical check Shockley's right shoulder where he had been tased. [Id. at 40].

17. Nurse Quayes checked Shockley for injuries and noted that, "[o]ther than non-bleeding taser probe marks on his upper back, no injuries to extremities or other part of the body noted," in the medical report made to document the medical portion of the incident. [Id. at 67].

18. After Shockley was transported out of the cell area, jail staff wearing personal protective equipment de-contaminated his cell, and placed all items in biohazard bags to be laundered. [Id. at 26, 35].

19. Shockley was in the restraint chair for just over two hours and during that time was checked at least nine times, at approximately 15-minute intervals. [Id. at 20]. At 2255, Lt. Reid spoke with Shockley, who promised to be compliant and Reid authorized his release him from

6

the chair. [Id. at 19].

20. Shockley was taken back to Crisis-2 and removed from the restraint chair at approximately 2304. Nurse Quaye checked Shockley after he was released from the restraint chair, cleared him, and he was placed in the shower. [Id. at 18, 35, 47, 49]. Lt. Reid emailed Mental Health regarding Shockley's status. [Id. at 35].

21. At approximately 2357, jail personnel attempted to bring Shockley back to his cell, but he refused to exit the shower despite multiple orders to stop running the water and place his hands through the shower door slot to be handcuffed. [Id. at 53, 56, 59, 62].

22. Lt. Reid, First Sgt. Adcock, Sgt. Hurd, and Cpl. Connolly, again, had to perform a noncompliant extraction of Plaintiff to remove him from the shower due to his lack of cooperation and return him to his cell in Crisis-2. [Id. at 53-54, 56, 59, 62].

23. During the noncompliant extraction from the shower, First Sgt. Adcock unholstered his taser and informed Shockley that if he became resistant or combative, he would be tased. [Id. at 53-54, 56]. Although Shockley did not comply and continued to resist, Adcock was able to guide Shockley to the floor with a hand on his shoulder. [Id. at 54, 56, 59, 62].

24. The taser was not deployed on Shockley in the shower. [Id. at 53-54, 56-57, 59-60, 62-63].

25. After he was restrained, Shockley was escorted back to his cell, his restraints were removed, and he was left alone. [Id. at 54, 57, 60, 63].

26. On March 1 2019, Shockley explained to medical personnel that the "voices were making me do this & that snakes were coming out of the drain to fight him." [Id. at 67]. Shockley was still on suicide watch after the two non-compliant extractions. [Id. at 66].

## II. Standard of Review

It is well settled that a motion for summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

Where, as in this case, the nonmoving party has the burden of proof at trial, the moving party need only demonstrate that there is a lack of evidence to support the non-movant's claim. See Celotex, 477 U.S. at 323-25. In response to such a showing, the party opposing summary judgment must go beyond the pleadings and proffer evidence that establishes each of the challenged elements of the case, demonstrating that genuine issues of material fact do exist that must be resolved at trial. See id. at 324; Anderson, 477 U.S. at 248. The party who bears the burden of proving a particular element of a claim must "designate 'specific facts showing there is a genuine issue for trial'" with respect to that element. Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

In reviewing the record on summary judgment, the Court "must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." Brock v. Entre Computer Ctrs., Inc., 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter

but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

The non-moving party, however, must show more than some metaphysical doubt as to the material facts. "[T]he non-moving party 'may not rest upon mere allegation or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial.'" Hughes v. Bedsole, 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting Anderson, 477 U.S. at 256). Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a scintilla of evidence will not carry this burden. See Anderson, 477 U.S. at 249-50. There must be evidence on which the jury could reasonably find for the non-moving party. Id. at 252. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the opposing party is entitled to a verdict.

When a defendant moves for summary judgment on ground that plaintiff lacks evidence of an essential element of his claim, plaintiff is required to present evidence of evidentiary quality (either admissible documents or attested testimony, such as that found in depositions or in affidavits) demonstrating existence of genuine issue of material fact; evidence need not be in admissible form, but it must be admissible in content, in sense that change in form but not in content, would make evidence admissible at trial. See Celotex, 477 U.S. at 324. Hearsay "is neither admissible at trial nor supportive of an opposition to a motion for summary judgment." Greensboro Professional Firefighters Ass'n v. City of Greensboro, 64 F.3d 962, 967 (4th Cir. 1995). Such "second-hand" information learned from others fails to satisfy a plaintiff's burden "to survive a motion for summary judgment." Monk v. Potter, 723 F. Supp. 2d 860, 875, 878 (E.D. Va. 2010) (citing Greensboro, 64 F.3d at 967; Riggs v. Airtran Airways, Inc., 497 F.3d 1108, 1121 (10th Cir. 2007) (noting that statements conveyed to plaintiff were "second-hand"

and inadmissible hearsay in opposition to summary judgment); Lemmons v. Georgetown Univ. Hosp., 431 F. Supp. 2d 76, 89-90 (D.D.C. 2006) (purported events related by plaintiff in her own deposition were based on second-hand information rather than personal knowledge and were therefore inadmissible hearsay for summary judgment purposes); Fed. R. Civ. P. 56(e) (supporting or opposing summary judgment affidavits must be based on "personal knowledge")).

### III. Analysis

Shockley alleges defendant Foster violated his constitutional rights because he was purportedly subjected to excessive force, which resulted in alleged injuries that did not receive medical attention. Defendant Foster denies Shockley's claims, and also asserts the defenses of qualified and Eleventh Amendment immunity.

*A. Use of Excessive Force*

Excessive force claims brought by pretrial detainees fall under the ambit of the Fourteenth Amendment's Due Process clause, because a state official does not technically have the authority to "punish" an un-convicted detainee. Coney v. Davis, 809 F. App'x 158, 159 (4th Cir. 2020) (citing Kingsley v. Hendrickson, 576 U.S. 389, 400-01 (2015)). Thus, in determining whether the use of force against a pretrial detainee was "excessive" under Kingsley, the Court need only consider whether the force "was objectively unreasonable." 576 U.S. at 397. This inquiry turns on the facts and circumstances of the individual case with a consideration of the "perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id.[5]

---

[5] A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 540 (1979). The Fourth Circuit has noted that federal courts "must accord due deference to an officer's efforts" to restrain a detainee "either to calm the general environment or to prevent [the detainee] from hurting himself" in order to not "encourage[] ... insubordination in an environment which is already volatile

Several factors prove particularly pertinent to this inquiry, including: (1) the relationship between the need for the force and the amount of forced used; (2) the extent of the plaintiff's resulting injury; (3) efforts made by the acting officer to "temper or limit" the amount of force used; (4) the severity of the security problem at hand; (5) the threat posed as reasonably perceived by the officer; and (6) whether the plaintiff was actively resisting. Id. While not an exhaustive list, the factors Kingsley identified constitute an appropriate starting point for the kinds of considerations that the Court must make in its excessive force determination. Id. Further, many of the factors considered when analyzing the subjective component of the Eighth Amendment test also constitute factors in the Fourteenth Amendment objective unreasonableness test. Mays v. Sprinkle, 992 F.3d 295, 300 (4th Cir. 2021) (courts have "traditionally looked to Eighth Amendment precedents" as guidance when considering Fourteenth Amendment claims).

Here, the RRJ officers were presented with an inmate, on suicide watch, that was behaving in an abnormal manner and continued to do so for an extended period. The behavior necessitated intervention by the officers on three separate occasions over the course of several hours. The first intervention occurred on February 28, 2019 at approximately 1610. Shockley hit his head against the floor several times and the officers needed to insure he had not injured himself. Shockley would not cooperate, and several officers were needed to enter the cell and place Shockley in restraints to allow a nurse to assess him. After the nurse cleared him at 1617, Shockley told the nurse that he "was fine," had "no injury to his head," and Shockley's restraints were removed. [Dkt. No. at 39-1 at 6, 10, 13, 16, 67].

The second intervention began about an hour-and-one-half later, at approximately 1750, when an officer observed Shockley smearing feces on his cell window. [Id. at 22]. By 1929,

---

enough.'" Grayson v. Peed, 195 F.3d 692, 697 (4th Cir.1999).

several officers had tried to get Shockley to comply and place his hands through the slot to allow the officers to place him in handcuffs, and then enter and apply the other restraints as before so that the cell could be cleaned and Shockley could be placed in the shower to clean himself. The SRT unit was notified and arrived at 2038. Sgt Foster tried talking with Shockley, but was unsuccessful. At 2042, Sgt. Foster and four other officers entered the cell to place Shockley in restraints so the cell could be cleaned, and Shockley could shower. Shockley repeatedly failed to comply with commands to stop resisting, openly resisted the efforts of the several officers, and was warned he would be tased if he continued to resist.

After Foster tased Shockley, the officers were able to place him in restraints and then into a restraint chair to allow Shockley to be transported. Sgt. Foster insured that medical would look at the taser marks and Shockley was examined by a nurse who noted that, "[o]ther than non-bleeding taser probe marks on his upper back, no injuries to extremities or other part of the body noted." [Id. at 67]. After Shockley had calmed down, and agreed to comply, he was taken back to Crisis-2 to shower and was released from his restraints at 2304 and placed in the shower.

The next intervention did not involve defendant Foster, but again required several officers to remove a noncompliant Shockley from the shower to his cell. Although the use of a taser was threatened, it was not deployed. The officers were able to place restraints on Shockley that allowed him to be moved back to his cell where the restraints were removed, and Shockley was left alone in his cell.

Where an inmate is not merely slow to comply with an order, but is engaged in aggressive, disruptive, or threatening conduct, an officer's use of a taser may be a permissible use of force. See Forrest v. Prine, 620 F.3d 739, 745 (7th Cir. 2010) (citing Lewis v. Downey, 581 F.3d 467, 477-78 (7th Cir. 2009)); see also Goodwin v. City of Painesville, 781 F.3d 314,

323 (6th Cir. 2015) ("Active resistance to an officer's command can legitimize an officer's use of a Taser...."). Reviewing the facts under the factors set forth in Kingsley, plaintiff had attempted to injure himself earlier in the evening while on suicide watch, was acting in an irrational manner by writing in feces on his cell walls and window (which created a biohazard and an unsafe living condition), swinging a blanket in an aggressive manner at times, experiencing hallucinations, and was repeatedly noncompliant with the officers. In response, the officers used minimal force, and only employed the taser after expressly warning Shockley he would be tased, and only after the repeated warnings and several officers were unable to place Shockley in restraints due to his resistance.[6] See Shreve v. Franklin County, Ohio, 743 F.3d 126, 135 (6th Cir. 2014) (use of a warning indicates the officers "were trying to avoid unnecessary harm," and fact that officers use of other means of restraint "before using the Taser shows that they sought to minimize the Taser's use"); see also Caie v. West Bloomfield Township, 485 F. App'x 92, 96-97 (6th Cir. 2012) (court held that the officer's single use of a taser was not unlawful where the plaintiff was intoxicated and suicidal, had mused about fighting the officers to get them to shoot him, ran and violently flailed his arms when the officers tried to detain him, and refused to comply with their order to move his hands from under his body so that he could be handcuffed); Williams v. Ingham, 373 F. App'x 542, 548 (6th Cir. 2010) (officers acted reasonably by tasing suspect who would not move his hands from under his body). The lack of any physical injury other than the taser marks indicates the force was "tempered" and necessary to remove Shockley to allow the fecal matter (which presented a health risk to Shockley and others) be cleaned and to have Shockley clean himself in the shower. Further, the taser was used

---

[6] For an inmate on suicide watch, RRJ policy required full restraints and a two-officer escort when he was moved outside his cell. [Dkt. No. 39-1 at 10, 13]. The policy is not at issue in this civil action.

only once, for a short duration, and did not result in any significant injury. See Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004) (single stun from a taser gun was reasonably proportionate use of force; did not inflict any serious injury as shown by the defendant was standing up, handcuffed, and coherent shortly after being stunned; and the taser gun may well have prevented a physical struggle and serious harm to either the defendant or the officer). Foster used the taser only after repeated attempts to subdue him by less forceful means, Shockley had ignored orders and a warning about the taser, while Shockley was actively resisting the officers' commands and their physical use of force aimed at obtaining control over a situation in the jail that posed a safety and security concern not only for Shockley himself, but others as well. See Labadie v. Mitchell, No. 17-1290, 2018 U.S. App. LEXIS 12440, *7-8 (6th Cir. May 11, 2018) ("aggression, disruption, or physical threat" by an inmate may justify using a taser to force compliance with a valid penological justification). Lastly, the taser was not deployed after Shockley stopped resisting.[7]

In sum, Sgt. Foster decision to use the taser to stun Shockley was reasonable and rationally related to legitimate government interests in managing the facility, preserving internal order and discipline, and maintaining security. Kingsley, 576 U.S. at 397. Defendant Foster's motion for summary judgment on Shockley's excessive force claim will be granted.

*B. Deliberate Indifference*

In his third amended complaint, Shockley alleged that he "requested a total of 5 times to

---

[7] In Russell ex rel. Russell v. Wright, 916 F. Supp. 2d 629 (W.D. Va. 2013), the Western District of Virginia reviewed several cases from the various circuit courts and determined that in the context of the Fourth Amendment, a dividing line between reasonable and unreasonable use of a taser was whether the arrestee was actively resisting the officers. Id. at 639 ("use of a taser was deemed appropriate when suspects refused to comply with officers' commands, and inappropriate where the suspects were complying or were attempting to comply"); see also Randolph-Ali v. Minium, 793 F. App'x 146, 150 (3d Cir. 2019) (in Fourth Amendment context, upholding district court's determination officer was entitled to qualified immunity because, at the time of the incident, "courts had held that the use of a taser on an individual who disobeys an officer or actively resists an officer's commands is constitutionally reasonable").

see medical staff," and that the officer on duty denied each request; and that he told the nurse who that evaluated him while he was in the restraint chair about the burn marks on his back but the nurse did not "examine [his] injury." [Dkt. No. 17 at 5]. Defendant Foster denies Shockley was denied medical care during the course of the events that evening and submitted evidence to support his position. As noted previously, Shockley did not dispute Foster's evidence.

The Fourth Circuit has held that pre-trial detainees have a right "to medical attention, and prison officials violate a detainee's right to due process [under the Fourteenth Amendment] when they are deliberately indifferent to serious medical needs." Gordon v. Kidd, 971 F.2d 1087, 1094 (4th Cir. 1992) (internal quotations omitted) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). Thus, plaintiff must allege two distinct elements to support a claim. First, he must allege a sufficiently serious medical need. A need is sufficiently serious if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008).

Second, plaintiff must allege that the defendant was deliberately indifferent to his serious medical need. Farmer v. Brennan, 511 U.S. 825, 837 (1994). An assertion of mere negligence or even malpractice is not sufficient to state an Eighth Amendment violation. See Estelle, 429 U.S. at 106. Instead, "an official acts with deliberate indifference if he had actual knowledge of the prisoner's serious medical needs and the related risks, but nevertheless disregarded them." DePaola v. Clarke, 884 F.3d 481, 486 (4th Cir. 2018) (citing Scinto v. Stansberry, 841 F.3d 219, 225-26 (4th Cir. 2016)). Significantly, a prisoner's disagreement with medical personnel over the course of his treatment is inadequate to state a cause of action. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); see also United States v. Clawson, 650 F.3d 530, 538 (4th Cir. 2011).

Here, the undisputed evidence presented by defendant Foster establishes that Shockley's claim fails on both prongs. First, the two taser burn marks were examined by a nurse shortly after Shockley was tased. The nurse noted the taser marks were not bleeding, and that Shockley had no other injuries. [Dkt. No. 39-1 at 67]. Indeed, defendant Foster specifically asked Lt. Reid to make sure Shockley was seen by "Medical" to check Shockley's right shoulder where he had tased Shockley. [Id. at 40]. Further, a taser burn is not an "objectively serious medical need." Hayward v. Kile, No. 07-0068, 2009 U.S. Dist. LEXIS 67504, * 25 (S.D. Ga. June 12, 2009) (granting defendant's motion for summary judgment and finding taser burn was not an objectively serious medical need), adopted, 2009 U.S. Dist. LEXIS 59472 (S.D. Ga. July 13, 2009.

Even if one assumes the taser burns satisfied the serious medical need prong, the uncontradicted evidence presented by defendant Foster stablishes that Shockley received medical attention by medical personnel that evening. After the first removal from his cell where he had beat his head against the floor and refused to cooperate with the officers, Shockley was examined by a nurse, who found he had no injuries to his head, and Shockley told the nurse he was fine. [Dkt. No. 39-1 at 6, 10, 13, 16, 67]. After Foster tased Shockley during the second non-compliant cell extraction, Foster specifically requested that Medical personnel examine Shockley's right shoulder where he had tased Shockley. A nurse examined Shockley for injuries and noted that, "[o]ther than non-bleeding taser probe marks on his upper back," Shockley had "no injuries to extremities or other part of the body noted." [Dkt. No. 39-1 at 67].[8] Shockley was returned to Crisis-2 to shower and the nurse checked him Shockley after he was released from

---

[8] The medical records also establish that Shockley was seen by mental health personnel on March 1, 2019. [Dkt. No. 39-1 at 66-67].

16

the restraint chair, cleared him, and Shockley was placed in the shower. [Id. at 18, 35, 47, 49].

In addition, Sgt. Foster was not a medical provider and as such he was entitled to rely on the judgment of the nurse to provide whatever care or treatment might be necessary. Prison officials are entitled to rely on the opinions, judgment, and expertise of medical personnel. See Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990) (finding that non-medical officers may rightly rely on determination by medical staff as to proper course of treatment); see also Giles v. Godinez, 914 F.3d 1040, 1049 (7th Cir. 2019) (non-medical prison officials are not deliberately indifferent if they rely on the professional judgment of prison medical staff); Spears v. Ruth, 589 F.3d 249, 255 (6th Cir. 2009) (explaining that officer was entitled to rely on assessments of medical professionals).

### IV. Conclusion

For the reasons outlined above, the defendant's motion for summary judgment [Dkt. No. 38] will be granted. An appropriate order shall issue alongside of this Memorandum Opinion.

Entered this 7 day of July 2021.

Alexandria, Virginia

/s/
Rossie D. Alston, Jr.
United States District Judge